### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| **United States of America** | : |
| | : |
| **v.** | :     **Case No. 3:06cr12 (JBA)** |
| | : |
| **Jose Calhelha, et al.** | : |

### <u>RULING ON PENDING MOTIONS [DOCS. ## 50, 52, 55]</u>

_____Defendants Jose Calhelha and Diana Calhelha, along with co-defendant Antonio Fernandes, are charged with various violations of the Immigration and Nationality Act relating to alleged activities involving illegal aliens including the illegal encouragement, harbor, and transport of aliens into and within the United States for the purpose of, <u>inter alia</u>, obtaining the service of these aliens at the Calhelhas' Dunkin' Donuts stores in Connecticut.  Specifically, the Superseding Indictment ("Indictment") [Doc. # 48] charges all defendants with conspiracy to encourage, harbor, and transport aliens illegally into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(v) (Count 1) and transport of aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 18 U.S.C. § 2 (Count 5).  Defendant Jose Calhelha is also charged with encouraging aliens to enter the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) and 18 U.S.C. § 2 (Count 2), bringing aliens into the United States for commercial advantage or private financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2 (Count 3), harboring

1

aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and 18
U.S.C. § 2 (Count 4), fraud in connection with false
identification documents in violation of 18 U.S.C. § 1028(a)(2)
and 18 U.S.C. § 2 (Count 6), and hiring of aliens in violation of
8 U.S.C. § 1324a(a)(1)(A).  Defendant Fernandes is also charged
with fraud in connection with false identification documents in
violation of 18 U.S.C. § 1028(a)(2) and 18 U.S.C. § 2 (Count 6).

Defendants Jose and Diana Calhelha now move to dismiss the
Superseding Indictment and for access to the grand jury
transcripts and/or for in camera review, see Mot. to Dismiss
[Doc. # 55], for a bill of particulars, see Mot. for Particulars
[Doc. # 52], and for discovery, see Mot. for Discovery [Doc. #
50].  For the reasons that follow, the motions to dismiss and for
discovery will be denied and the motion seeking a bill of
particulars will be granted in part and denied in part.

## I.   Facts Alleged in Indictment

The Indictment claims that Jose and Diana Calhelha and
Antonio Fernandes conspired to encourage, harbor, and transport
aliens illegally into the United States by alleging the following
facts.  Jose Calhelha owned and operated 10 Dunkin' Donuts stores
in Connecticut between 2002 and 2005 and Diana Calhelha had an
ownership interest in at least one of those stores.  Indictment
¶¶ 4-5.  Beginning in 2002, Jose Calhelha "devised a plan to
recruit aliens from Portugal who would travel to the United

States to be employed at his Dunkin' Donuts stores.  All of the
aliens were to be brought into the United States for commercial
advantage, private financial gain, and in violation of the
immigration laws of the United States." _Id_. ¶ 6.

According to the Indictment, Jose Calhelha "recruited aliens
to illegally work in the United States by, among other methods,
advertising in a Portugese newspaper for employees for his
Dunkin' Donuts stores;" "defendants transported aliens from
Newark International Airport to Connecticut and within
Connecticut so that these aliens could work at the various
Dunkin' Donuts stores;" "Jose Calhelha employed the aliens at the
various Dunkin' Donuts stores knowing that they did not have
authorization to work in the United States;" "Jose Calhelha
initially paid some of the aliens in cash.  For a period of time
he also paid aliens by checks made payable to fraudulent
identities on the checks;" "Jose Calhelha sold fraudulent
identity documents to aliens recruited and employed to manage his
stores and later paid them with checks payable in the names
appearing on the fraudulent United States identity documents;"
"Antonio Fernandes sold fraudulent identity documents to at least
one alien recruited from Portugal;" "Diana Calhelha and Antonio
Fernandes during various time periods would oversee the
management of some or all of the stores knowing that some of the
managers and employees were undocumented aliens;" and "Diana

3

Calhelha directed the aliens as to where they would work,
transported them to their job sites and directed them as to what
job functions they would perform on particular days." Id. ¶¶
20(a)-(h).

Fleshing out the overt act allegations, the Indictment also
states that, in addition to placing an advertisement in at least
one Portugese newspaper seeking individuals to work in his
Dunkin' Donuts stores, Jose Calhelha also "met with aliens in
Portugal knowing that they did not have employment authorization
to work in the United States and offered them positions in his
Dunkin' Donuts stores.  During these meetings in Portugal, Jose
Calhelha made promises to them about their position, salary,
compensation package, and immigration status.  Diana Calhelha was
present during at least one of these meetings.  During these
meetings, Jose Calhelha directed them to purchase airline tickets
for travel from Portugal to the United States and reimbursed them
for the airfare." Id. ¶¶ 7-8.  The Indictment also alleges
exploitation of the aliens and physical assault of two of the
aliens by defendant Fernandes, "creating an environment of
intimidation and harm." Id. ¶ 20(i).  The Indictment further
alleges that "[d]uring the period of the conspiracy it appears
that more than fifty percent (50%) of the individuals employed by
[Jose Calhelha] at his various Dunkin' Donuts Stores were aliens
who were utilizing social security numbers that were invalid or

4

did not match the individual." Id. ¶ 11.  The Indictment claims
that Jose and Diana Calhelha "knowingly completed, caused to be
completed, and maintained fraudulent I-9 employment forms for the
aliens" and that "Jose Calhelha knowingly filed and caused to be
filed W-2 and W-3 tax forms with the Internal Revenue Service
containing false identity information." Id. ¶¶ 12-13.

## II.  Motion to Dismiss or for *In Camera* Review

### A.    Standard

Upon a motion to dismiss in a criminal case, the allegations
in the indictment must be accepted as true. See United States v.
Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998).  "The indictment .
. . shall be a plain, concise and definite written statement of
the essential facts constituting the offense charged." Fed. R.
Crim. P. 7(c)(1).  "[A]n indictment is sufficient if it, first,
contains the elements of the offense charged and fairly informs a
defendant of the charge against which he must defend, and,
second, enables him to plead an acquittal or conviction in bar of
future prosecutions for the same offense." Hamling v. United
States, 418 U.S. 87, 117 (1974) (citations omitted); accord
Alfonso, 143 F.3d at 776.  "It is generally sufficient that an
indictment set forth the offense in the words of the statute
itself, as long as those words of themselves fully, directly, and
expressly . . . set forth all the elements necessary to
constitute the offence intended to be punished." Hamling, 418

U.S. at 177 (internal quotations omitted).  The indictment "must descend to particulars," however, if "the definition of an offense . . . includes generic terms."  <u>United States v. Cruikshank</u>, 92 U.S. 542, 558 (1875) (internal citation omitted); <u>accord</u> <u>United States v. Pirro</u>, 212 F.3d 86, 92-93 (2d Cir. 2000).

In the absence of a full proffer of the Government's evidence, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." <u>Alfonso</u>, 143 F.3d at 776-77 (reversing dismissal of an indictment when the district court "looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the government at trial" to satisfy an element of the charge); <u>accord</u> <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956) (If "valid on its face," a grand jury indictment "is enough to call for trial of the charge on the merits.") (citations and footnote omitted).

<u>      **B.   Discussion**</u>

Defendants Jose and Diana Calhelha move to dismiss the Superseding Indictment, claiming "it fails to allege all elements of the alleged charges and fails to state material facts constituting elements of those charges."  Mot. to Dismiss [Doc. # 55] at 1.  "Alternatively, defendants move for access to grand jury transcripts and/or for in camera review of those transcripts, pursuant to Rule 6(e)(3)(E)(ii) of the Federal Rules

of Criminal Procedure, because defendants contend that the grand

jury was not presented with sufficient information to enable it

to have found probable cause that they each committed each

element of the offenses set forth in the Superseding Indictment."

Id. at 1-2.  The Court will address defendants' arguments

specific to each count in turn.

Count 3

Count 3 of the Indictment, as noted above, charges "Bringing

Aliens into the United States" in violation of 8 U.S.C. §

1324(a)(2)(B)(ii) and 18 U.S.C. § 2.  8 U.S.C. §

1324(a)(2)(B)(ii) provides:

> Any person who, knowing or in reckless disregard of the
> fact that an alien has not received prior official
> authorization to come to, enter, or reside in the
> United States, brings to or attempts to bring to the
> United States in any manner whatsoever, such alien,
> regardless of any official action which may later be
> taken with respect to such alien shall, for each alien
> in respect to whom a violation of this paragraph
> occurs-- . . . in the case of-- . . . an offense done
> for the purpose of commercial advantage or private
> financial gain . . . be fined under Title 18 and shall
> be imprisoned, in the case of a first or second
> violation of subparagraph (B)(iii), not more than 10
> years, in the case of a first or second violation of
> subparagraph (B)(i) or (B)(ii), not less than 3 nor
> more than 10 years, and for any other violation, not
> less than 5 nor more than 15 years.

18 U.S.C. § 2 provides that "[w]hoever commits an offense against

the United States or aids, abets, counsels, commands, induces or

procures its commission, is punishable as a principal," and

"[w]hoever willfully causes an act to be done which if directly

7

performed by him or another would be an offense against the United States, is punishable as a principal."

Defendants contend that Count 3 is invalid as it does not allege that Jose Calhelha knew that the aliens entered the United States without prior official authorization, but only that he knew or acted with reckless disregard for the fact that the aliens had not received prior official authorization to enter the United States <u>for work</u>.  Indictment ¶ 24.  Defendants also contend that the Indictment does not sufficiently allege that Jose Calhelha did anything to bring the aliens into the United States, nor does it adequately allege that he brought the aliens into the United States for purpose of commercial advantage or private financial gain, as required by § 1324(a)(2)(B)(ii).

As to defendant's first contention, the allegation in the Indictment that Jose Calhelha acted "knowing and in reckless disregard of the fact that the aliens had not received prior official authorization to enter the United States for work," Indictment ¶ 24, is sufficient to state an offense under § 1324(a)(2)(B)(ii).  In <u>United States v. Gasanova</u>, 332 F.3d 297, 299 (5th Cir. 2003), the Fifth Circuit rejected an analogous claim by defendants who argued that it was not a violation of § 1324(a)(2) "to bring an alien to the United States known to be ineligible to enter so long as when brought the alien holds a visa issued by a proper government authority, <u>even if they knew</u>

the alien's visa was obtained through fraud or artifice"
(emphasis added).  The Fifth Circuit stated that "[t]o construe
official authorization as including a document the defendant
knows to be mistakenly-issued or fraudulently-obtained would
thwart th[e] objective [to combat illegal immigration].  It would
permit a defendant to bring to the United States an alien who the
defendant knows is ineligible to enter so long as the defendant
succeeds in purloining a visa from an official source.  Because
this interpretation would contravene the fundamental purpose of
the legislation through which § 1324(a)(2) was enacted we reject
it."  Id.[1]  There is no dispute that 8 U.S.C. § 1182(a)(6)(c)
provides that "[a]ny alien who, by fraud or willfully
misrepresenting a material fact, seeks to procure (or has sought

---

[1] Defendants contend that Gasanova "provides no insight into
whether the aliens in this case lacked 'prior official
authorization' to enter" because that case concerned "whether the
defendant had knowledge that the aliens did not have 'prior
official authorization to enter,'" and concluded that "defendants
could not rely on the fact that the aliens had entered with
facially valid visas in light of their personal participation in
committing visa fraud in obtaining such visas.  Def. Mem. at 10
n.6.  However, while the circumstances in Gasanova were not
identical to those here, as described above Gasanova is
nevertheless analogous and supports the conclusion that admission
premised on the Visa Waiver Program could nevertheless be
unauthorized if entry based on that program was procured by fraud
or by willfully misrepresenting a material fact (i.e. that the
aliens were not entering the United States for 90 days or less,
but were to remain here indefinitely, working illegally).
Further, as set out infra note 2, the Indictment specifically
alleges that defendants acted knowing, or in reckless disregard
of the fact, that the aliens had come to and remained in the
United States illegally.

to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."  Accordingly, the Indictment sufficiently alleges the scienter element of a § 1324(a)(2)(B)(ii) violation as it alleges Jose Calhelha knew or acted with reckless disregard of the fact that the aliens entered without work authorization, and thus, if the allegations are proved, their admission into the United States pursuant to the Visa Waiver Program was procured by fraud because the Program "enables nationals of certain countries to travel to the United States for tourism or business for stays of 90 days or less without obtaining a visa," see http://www.travel.state.gov/ visa/temp/without/without_1990.html#1, and the aliens were coming to work in the United States unlawfully (that is, without work authorization) and indefinitely.[2]

As to defendants' second argument, the facts alleged in the Indictment are sufficient to support a "bringing" offense under § 1324(a)(2).  Defendants contend that at most the allegations in

_____

[2] Defendants argue that the Government has not sufficiently pled this theory because the allegations do not provide that Jose Calhelha knew that entering the United States under fraudulent pretenses pursuant to the Visa Waiver Program was illegal and would render an alien inadmissible.  However, contrary to defendants' contentions, the Indictment specifically alleges that Jose Calhelha, and indeed all three defendants, acted "knowing and in reckless disregard of the fact that aliens had come to, entered, and remained in the United States in violation of law." See ¶¶ 18, 19, 22 (emphasis added).

the Indictment support an offense of encouraging aliens to enter the United States because "the word 'bringing,' as used in the statute, is given its usual and customary meaning [and] [b]y definition, there must be some physical act by which the defendant transports the aliens, i.e. an 'escorting or accompanying component.'" Def. Mem. [Doc. # 55-2] at 13 (citing United States v. Assadi, 223 F. Supp. 2d 208, 210 (D.D.C. 2002)). Defendants compare the circumstances of this case to those in Assadi, and claim that in Assadi the alleged smuggler "generally engages in some physical act to enable the alien to gain entry in the United States," and "the Court in Assadi held that even all of that activity did not constitute 'bringing in.'" Id. at 13-14.

In Assadi, the defendant "created or procured falsified passports for the aliens, bought them airline tickets, . . . procured boarding passes for them, and took them to the airport. He instructed them to destroy their travel documents once they were airborne, to ask for asylum when they deplaned in Miami, and to lie if asked who had arranged their passage." Assadi, 223 F. Supp. 2d at 209. However, "Assadi did not accompany any of the aliens on their flights to Miami, nor did he meet them (or arrange to have them met) when they arrived. His involvement with the aliens ended as soon as he saw them to their flights." Id. The Assadi court noted that "'bring' means 'to convey, lead, carry or cause to come along from one place to another . . . to

11

escort, or accompany.  It does not mean 'send' or 'launch.'  The first definition listed in the Oxford English Dictionary is: 'To cause to come along with oneself; to fetch.  It includes 'lead' or 'conduct' . . . as well as 'carry . . . ; it implies motion towards the place where the speaker or auditor is, or is supposed to be, being in a sense the causal of come.'"  Id. at 210.  The Asadi court further noted "[n]othing in Fowler['s Modern English Usage] or in Webster or the OED, or in correct common usage, supports the use of 'bring' when there is neither movement towards the speaker nor accompaniment."  Id.  The court thus held that while "'bringing to' does not require control of the means of transport," it must involve an "escorting or accompanying component."

This case, however, is distinguishable from Assadi: the Indictment alleges that, in addition to recruiting and meeting with the aliens and paying for their airline fare, Jose Calhelha also "[u]pon their arrival in the United States . . . transported the aliens, or arranged for their transport, from Newark International Airport to his residence in Guilford, Connecticut where the aliens stayed for a period of time."  Indictment ¶ 8. Thus, Jose Calhelha, unlike Assadi, participated in "motion towards the place where [he] [wa]s, or [was] supposed to be," Asadi, 223 F. Supp. 2d at 210, and indeed accompanied them himself directly from the airport to the place where they would

12

be staying, his home.  The circumstances of this case are thus more analogous to those in <u>United States v. Aslam</u>, 936 F.2d 751 (2d Cir. 1991), in which the Second Circuit reversed a district court's direction of defendant's acquittal on this issue, holding that § 1324(a)(2) applied to defendant's conduct in meeting two aliens in the United States within a few yards of the border shortly after they had walked across it.  The Second Circuit observed that "section 1324(a)(2) punishes those <u>who participate in the process</u> of bringing illegal aliens into the United States, and that . . . offense does not end at the instant the alien sets foot across the border.  The illegal importation of aliens, like the illegal importation of drugs, . . . continues at least until the alien reaches his immediate destination in this country." <u>Id</u>. at 755 (emphasis added).  According to the allegations in the Indictment, Jose Calhelha not only participated in the process of bringing illegal aliens into the United States, but also devised and instigated the process, and saw it to conclusion by receiving the aliens at Newark International airport and "bringing" them to Connecticut.  These allegations are sufficient, under <u>Aslam</u> and <u>Asadi</u>, to state a § 1324(a)(2) violation.

Defendants' last argument concerning Count 3 is that the Indictment insufficiently alleges that Jose Calhelha brought aliens into the United States "for the purpose of commercial advantage or private financial gain" as required by §

13

1324(a)(2)(B)(ii).  Defendants contend that "[g]enerally, this
has meant that a person gets a 'smuggling fee' for bringing
illegal aliens into the United States . . . [and] [t]he
Superseding Indictment does not allege that Mr. Calhelha received
such a fee from anyone."  Def. Mem. at 15.  This narrow reading
of the "commercial advantage or private financial gain" provision
of § 1324 does not comport with case law which more broadly
construes the scope of such motivation.  The Second Circuit in
United States v. Dae Whan Kim, 435 F.3d 182, 185 (2d Cir. 2006),
stated "the statute does not require evidence of an 'actual
payment or even an agreement to pay' but merely requires that the
defendant acted 'for the purpose of financial gain.'"  Likewise,
in United States v. Myung Ho Kim, 193 F.3d 567 (2d Cir. 1999),
the court found that defendant had acted "for the purpose of
commercial advantage of private financial gain" in retaining an
illegal alien as "a valued managerial employee," affirming the
district court's reasoning that "[i]f a businessman . . . makes a
decision such as the one he did with respect to [the illegal
alien], a decision to direct her to falsify a document, a
decision to do so in connection with the running of his business,
one would think that it's a simple, common sense inference that
he's doing it for a business reason, lawful or unlawful business
reason, but a business or profit-motivated reason."  Id. at 577.
The Second Circuit relied on the fact that "[t]here was no

14

evidence that [the defendant] had harbored [the alien] out of any feelings of charity or affection, or that he had any motive other than the profitability of his business." Id. The Kim court also adopted the broad common definitions for the statutory terms: "[t]he usual meaning of 'commercial,' for example, is 'relating to commerce,' or 'from the point of view of profit: having profit as the primary aim,' . . . while 'advantage' signifies a 'benefit, profit, or gain of any kind.'" Id.

The Indictment here alleges that Jose Calhelha devised this scheme, recruited aliens, and brought them into the United States for the purpose of working in his stores. It also states that defendants paid the aliens significantly substandard wages and required them to work excessively long hours without overtime pay. Moreover, there is no suggestion or inference to be drawn from the allegations that Jose Calhelha did this for any reason other than to personally profit from exploiting these individuals. Thus, the Indictment's allegations are sufficient for § 1324(a)(2)(B)(ii) purposes, pursuant to the Second Circuit authority outlined above.

Counts 1-2, 4-5

As to Counts 1-2 and 4-5, which allege conspiracy to encourage, harbor, and transport aliens illegally into the United States (Count 1), encouraging aliens to enter the United States (Count 2), harboring aliens (Count 4), and transporting aliens

15

(Count 5), defendants' reiterate some of their arguments as to Count 3; specifically, defendants contend that the allegations in these counts are insufficient to establish that the aliens' entry into and presence in the United States was unlawful, that the Indictment fails to allege facts that would establish that the defendants knew or acted in reckless disregard of the aliens' allegedly unlawful immigration status, and that the Indictment fails to adequately allege that defendants acted for commercial advantage or private financial gain.

8 U.S.C. § 1324(a)(1)(A)(ii)-(iv), respectively, prohibit the transport of aliens, the harboring of aliens, and the encouragement of aliens, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law" (or, for the encouragement offense, "knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of the law"). Section 1324(a)(1)(A)(v) prohibits conspiracy to commit any of the above offenses and/or a "bringing offense."  Contrary to defendants' contentions, the allegations in the indictment suffice to allege scienter as they track the language of Section 1324: "Jose Calhelha . . . knowing and in reckless disregard of the fact that aliens had come to, entered, and remained in the United States in violation of law . . .," "the defendants . . . knowing and in reckless disregard of the fact that aliens had

16

come to, entered, and remained in the United States in violation
of law . . .," "Jose Calhelha . . . knowing and in reckless
disregard of the fact that such coming to, entry, and residence
was and would be in violation of law."  Indictment ¶¶ 18, 19, 22.
Further, as set out above, the allegations comport with statutory
requirements because 8 U.S.C. § 1182(a)(6)(c) renders "[a]ny
alien who, by fraud or willfully misrepresenting a material fact,
seeks to procure (or has sought to procure or has procured) a
visa, other documentation, or admission into the United States or
other benefit provided under this chapter" inadmissible, and the
aliens in this case were thus inadmissible because they were
admitted pursuant to the Visa Waiver Program whereas they entered
the United States – as defendants knew – indefinitely, for the
purpose of working in the Calhelha's Dunkin' Donuts stores, and
without work authorization.  Whether the Government will be able
to prove its allegations at trial that defendants were aware of,
or acted in reckless disregard of, the unlawfulness of the
aliens' entry and presence in the United States, is not properly
considered at this stage.  See Alfonso, 143 F.3d at 776-77,
supra.

    As to defendants' contentions regarding the sufficiency of
the allegations that Jose and Diana Calhelha acted for the
purpose of commercial advantage or financial gain, as described
above with respect to Count 3 these allegations are sufficient.

The allegations track the language of the statute, set forth that both Calhelhas had an ownership interest in the stores, and describe that the aliens working in those stores worked excessively long hours for substandard pay.  Accordingly, based on the Second Circuit authority defining the scope of this requirement described above, these allegations and facts in the Indictment are sufficient.[3]

        Count 6

        Count 6 charges Jose Calhelha, along with defendant Fernandes, with a violation of 18 U.S.C. § 1028(a)(2), which provides that "[w]hoever, in a circumstance described in subsection (c) of this section-- . . . (2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority . . . shall be punished as provided in subsection (b) of this section."  The circumstances described in subsection (c) include that "the identification document, authentication feature, or false

_____

        [3] In any event, the Court is unclear as to the basis of defendants' claim that "the crimes charged in Counts Two, Four and Five require that Jose Calhelha and Diana Calhelha engaged in the unlawful conduct in question 'for the purpose of commercial advantage or financial gain.'" Def. Mem. at 17.  Unlike the "bringing" violation charged in Count 3 against Jose Calhelha, which is discussed above, the statutory subsections providing the basis for the crimes charged in Counts Two, Four and Five do not contain a requirement that the actions were taken "for the purpose of commercial advantage or financial gain."  See 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv).

identification document is or appears to be issued by or under the authority of the United States or a sponsoring entity of an event designated as a special event of national significance or the document-making implement is designed or suited for making such an identification document, authentication feature, or false identification document" as well as "either--(A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or (B) the means of identification, identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section."

Defendants contend this count is flawed because the Indictment fails to identify all of the false documents allegedly transferred by Mr. Calhelha, but only states "including a lawful permanent resident card (green card) and a social security card." Indictment ¶ 31.  Defendants further argue that the Government must prove that the documents are "identification documents" under the section, and while green cards and social security cards would satisfy this definition, the use of the word "including" is vague.

By their argument defendants thus admit that the allegations in Count 6 are sufficient to state a violation of § 1028 by

acknowledging that it alleges Jose Calhelha transferred falsified documents which meet the definition of "identification documents" under the statute (a green card and social security card). Moreover, while defendants contest the Government's use of the word "including," without identification of any additional claimed falsified documents, the Government represents that the investigative reports provided to defendants identify the aliens who bought documents from Mr. Calhelha, and that the Government has obtained copies of all such claimed documents and has produced them to defendants.  Cf. United States v. Bernstein, 533 F.2d 775, 786-87 (2d Cir. 1976) ("The indictment as amplified by the bill of particulars made clear to the appellants what was the nature and cause of the Government's case and gave them ample opportunity to prepare their defense.").  Count 6 is thus sufficient as it tracks the language of the statute and alleges transfer of falsified documents covered by the statute, and defendants have been provided notice of the claimed falsified documents sufficient for trial preparation and double jeopardy purposes.

Count 7

Count 7 asserts a violation of 8 U.S.C. § 1324a(a)(1)(A), which makes it unlawful "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such

20

employment."  Count 7 alleges that Jose Calhelha "did hire or
caused to be hired aliens for employment at the various Dunkin'
Donut stores with actual knowledge that they were and are aliens
who had not been lawfully admitted for residence in the United
States and had not been authorized for employment by law or by
the Attorney General or his successor, the Secretary of Homeland
Security."  Indictment ¶ 33.  Defendants contend that in order to
qualify for criminal penalties, an indictment must allege a
pattern and practice of violations, citing § 1324a(f)(1), and
they argue that the Indictment does not allege facts which would
support a finding that Mr. Calhelha engaged in a "pattern and
practice" of illegal hiring violations, as Count 7 does not
identify which employees are claimed to have been illegally
hired, or how many.  "Pattern and practice" is defined as
"regular, repeated, and intentional activities, but does not
include isolated, sporadic, or accidental acts." 8 C.F.R. §
274a.1(k).

The earlier allegations in the Indictment, which are
incorporated by reference into Count 7, adequately allege a
"pattern and practice" of illegal hiring.  Specifically, the
Indictment alleges that Mr. Calhelha "devised a plan to recruit
aliens from Portugal who would travel to the United States to be
employed at his Dunkin' Donuts stores," Indictment ¶ 6, that
"[i]n order to carry out his plan . . . Jose Calhelha placed an

21

advertisement in or about 2002 in at least one Portugese
newspaper seeking individuals in Portugal . . . to work as
managers in his Dunkin' Donuts stores," id. ¶ 7, that "[i]n
furtherance of this plan, Jose Calhelha met with aliens in
Portugal knowing that they did not have employment authorization
to work in the United States and offered them positions at [his]
stores," made promises to them about employment benefits and
directed them to purchase airline tickets for which he would
reimburse them, id. ¶ 8, and that "[s]hortly after arriving in
the United States, the aliens began working for Calhelha in his
Dunkin' Donuts stores without obtaining work authorization," id.
¶ 9.  Count 7 specifically alleges that Mr. Calhelha hired or
caused to be hired these aliens "with actual knowledge that they
were and are aliens who had not been lawfully admitted for
residence in the United States and had not been authorized for
employment."  Id. ¶ 33.

8 C.F.R. § 274a.1(k) does not require the Indictment to
specifically identify the aliens claimed to have been illegally
hired, nor to state the specific number of illegally hired
aliens.  As described in the preceding paragraph, the Indictment
sufficiently alleges that Mr. Calhelha intentionally engaged in a
plan to recruit and hire multiple aliens to work in his stores.
As opposed to "isolated, sporadic, or accidental acts," the
Indictment details a deliberately devised and executed scheme by

which Mr. Calhelha placed newspaper advertisements, attended meetings in Portugal, and financed transcontinental airline passages, resulting in his hiring of multiple aliens who, according to the Indictment, he knew were unauthorized for such employment in the United States.

Moreover, the Government represents that it has identified for defendants, by way of law enforcement reports and witness lists, the aliens who are alleged to have, <u>inter alia</u>, worked in defendants' stores.  Thus, the Indictment sufficiently alleges a "pattern and practice" and defendants' claims that the Indictment does not identify the aliens, or even how many, that were involved, when they were hired, or how Mr. Calhelha knew they were unauthorized, do not suffice to undermine the adequacy of the Indictment, particularly because the relevant portions of that information have already been provided.[4]

<u>All Counts</u>

The Court appreciates defendants' argument as to all counts that the Indictment fails to identify the aliens alleged to have been involved in the illegal conduct charged.  However, the Government represents that the aliens have been identified in witness lists, law enforcement reports and other documentation

---

[4] The Indictment alleges time frame in approximate terms, which is all that is required, and it need not allege <u>how</u> Mr. Calhelha knew the aliens were unauthorized, only <u>that</u> he knew they were unauthorized, which it does.

provided to defendants, including documents from the Social
Security Administration which the Government contends shows that
Jose Calhelha "was on notice year after year as to the number of
aliens working at his stores who had false or improper social
security numbers."  Gov't Opp. at 18.  As noted above, the Second
Circuit has "consistently sustained indictments which track the
language of the statute and, in addition, do little more than
state time and place in approximate terms." Bernstein, 533 F.2d
775 at 786.  As detailed above, the Indictment in this case
complies with this requirement, and the statutory provisions at
issue do not require specific identification of aliens.  However,
defendants' claim that without identification of the aliens the
charges are insufficiently detailed to guard against double
jeopardy will be addressed below in considering the request for a
bill of particulars.  Cf. Bernstein, 533 F.2d at 786-87 ("The
indictment as amplified by the bill of particulars made clear to
the [defendants] what was the nature and cause of the
Government's case and gave them ample opportunity to prepare
their defense.").

        Grand Jury Transcripts

    As to defendants' request for disclosure of the grand jury
transcripts or, at minimum, for the Court's in camera review of
those transcripts, "[t]he indictment alone, . . . absent any
suggestion of grand jury bias or that it was illegally

24

constituted, 'is enough to call for trial of the charge on the merits.'" United States v. Shakur, 560 F. Supp. 347, 350 (S.D.N.Y. 1983) (citing Costello v. United States, 350 U.S. 359, 363 (1956) ("If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary proceeding to determine the competency and adequacy of the evidence before the grand jury.  This is not required by the Fifth Amendment.  An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more.").

Apart from challenging the face of the Indictment itself, as detailed above, and defendants' speculative and conclusory claim that "it appears that the grand jury was not presented with sufficient information to enable it to have found probable cause that Defendants committed the offenses alleged," Def. Mem. [Doc. # 55-2] at 25, defendants make no suggestion of grand jury bias, or that the grand jury was illegally constituted.  Accordingly, their request for production or in camera review of the grand jury transcripts must be denied.

25

## III. Motion for Bill of Particulars

####      A.    Standard

     "It has long been settled that an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy." United States v. Salazar, 485 F.2d 1272, 1277 (2d. Cir. 1973). Accordingly, Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  Courts have "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms," Salazar, 485 F.2d at 1277, and thus "[a] bill of particulars is required 'only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Ojeikere, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) (quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)).  "The decision to grant or deny a bill of particulars is within the sound discretion of the district court." United States v.

26

Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." Bortnovsky, 820 F.2d at 574.  Additionally, "[i]t is repeated over and over again in the cases that a bill of particulars may not call for an evidentiary matter.  Other cases say the government will not be required to disclose its legal theory on a bill of particulars." United States v. Ganim, 225 F. Supp. 2d 145, 156 (D. Conn. 2002) (citing Wright & Miller, Fed. Practice & Procedure 3d, § 129 at 659-60); accord Davidoff, 845 F.2d at 1154 ("The prosecution need not particularize all of its evidence."); Ojeikere, 299 F. Supp. 2d at 260 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories.").  Further, "[t]he crucial question is whether the information sought is necessary, not whether it is helpful." United States v. Love, 859 F. Supp. 725, 738 (S.D.N.Y. 1994), aff'd sub nom. United States v. Roberts, 41 F.3d 1501 (2d Cir. 1994).

**B.  Discussion**

As a preliminary matter, the Government notes that defendants previously made a motion for bill of particulars,

which was denied, and thus the Government contends that defendants' motion is actually one for reconsideration.  However, because defendants' previous motion predated the current Superseding Indictment, and thus the context for any motion for a bill of particulars has changed, the Court will not apply the strict standard for reconsideration motions to the instant motion.

Defendants seek a bill of particulars providing: (1) the identification of the aliens at issue in each count; (2) the identification of all documents that are the basis for the offense charged in Count Six; and (3) information about whether each of the aliens at issue in Counts One through Five is one who has (a) come to the United States unlawfully; (b) entered the United States unlawfully; (c) remained in the United States unlawfully; or (d) resided in the United States unlawfully.

As to defendants' second request – for identification of all of the documents implicated by Count Six – as discussed above the law enforcement reports produced to defendants identify the aliens who allegedly bought documents from Mr. Calhelha and the Government has also produced copies of all such claimed documents to defendants.  Defendants do not take the position that the Government's discovery production, as detailed in its opposition memoranda to defendants' motions, is inadequate in some way.  Thus, defendants' motion as to this information is denied.  See

Bortnovsky, 820 F.2d at 574 ("Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required.").

      As to the request for identification of all aliens at issue in each of the Counts, as well as additional information regarding the status of each of the aliens at issue in Counts One through Five, the Government contends that it need not identify each and every alien at issue because it has charged only one count of each offense, and thus unlawful conduct with respect to even just one alien would suffice, and it also argues that the additional information sought has already been provided in the Government's witness lists, investigative reports produced, and social security documents disclosed.  While "[i]t is repeated over and over again in the cases that a bill of particulars may not call for an evidentiary matter [and] the government will not be required to disclose its legal theory on a bill of particulars," Ganim, 225 F. Supp. 2d at 156, defendants are entitled to a bill of particulars to provide detail where necessary to allow a defendant "to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense," Bortnovsky, 820 F.2d at 574.  The Court here must determine on which side of this line defendants' requests fall.

    Defendants' requests for identification of the aliens at issue in each count is appropriate and necessary to permit them

29

to interpose a plea of double jeopardy.  While the Government may only need to prove illegal conduct with respect to one alien in order to prove the offenses charges, this argument avoids the question of which aliens are in fact at issue in the crimes for which defendants are charged.  "The federal rule is that jeopardy attaches when the jury is empaneled and sworn," Crist v. Bretz, 437 U.S. 28, 29 (1978), and thus defendants must know the offenses with which they are charged, sufficient for pleading double jeopardy in any subsequent prosecution, at that time, not after trial.  Likewise, defendants must know which illegal activity (e.g., encouraging, bringing, harboring, transporting, etcetera) is charged with respect to which aliens, also in order for them to interpose a plea of double jeopardy in a later proceeding.  Without such information, defendants would not know if they were charged with harboring aliens A and B in this proceeding, such that they could be charged with harboring alien C in a subsequent proceeding, or whether they are charged with harboring all three aliens in this prosecution and thus could not be prosecuted for harboring any one of the three in any subsequent proceeding.  Accordingly, defendants' motion as to this information will be granted and the Government is directed to provide identification of the aliens at issue in each of Counts One through Five (by count) to defendants within 10 calendar days from the date of this ruling.

As to defendants' request for additional information as to whether the aliens are claimed to have come to, entered, remained in, or resided in the United States unlawfully, this information crosses the line into seeking evidentiary material and/or information about the Government's legal theories. With the information discussed above which the Government has been directed to provide, defendants will be aware of all of the aliens at issue in each particular count, which will enable them to properly prepare for trial by gathering all relevant documentary evidence concerning those aliens and by preparing to question those individuals (the Government has also already provided its witness list). The immigration status and nature of each alien's legal relationship with the United States is not necessary to this trial preparation, nor to a future plea of double jeopardy in any subsequent prosecution, and thus defendants are not entitled to this information. Accordingly, defendants' motion as to this information will be denied.

## IV.  Motion for Discovery

### A.    Standard

The Supreme Court's decision in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, including <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972), require that:

> To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant.

31

> . . . Information coming within the scope of this
> principle . . . includes not only evidence that is
> exculpatory, _i.e._, going to the heart of the
> defendant's guilt or innocence, but also evidence that
> is useful for impeachment, _i.e._, having the potential
> to alter the jury's assessment of the credibility of a
> significant prosecution witness.

United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998)
(citing, inter alia, Brady, 373 U.S. at 87).  Accordingly an
"individual prosecutor has a duty to learn of any favorable
evidence known to the others acting on the government's behalf in
the case, including the police." Kyles v. Whitley, 514 U.S.
419, 437 (1995).  Thus, "[d]ocuments that the Government has
reviewed or has access to must be provided to aid a defendant in
preparing his [or her] defendant," however, "[t]he prosecutor
need not . . . produce documents from agencies that did not
participate in the investigation of the defendant or documents of
which it is unaware." See United States v. Giffen, 379 F. Supp.
2d 337, 343 (S.D.N.Y. 2004) (citing cases).

The Jencks Act, 18 U.S.C. § 3500, provides that "[a]fter a
witness called by the United States has testified on direct
examination, the court shall, on motion of the defendant, order
the United States to produce any statement (as hereinafter
defined) of the witness in the possession of the United States
which relates to the subject matter as to which the witness has
testified.  If the entire contents of any such statement relate
to the subject matter of the testimony of the witness, the court

32

shall order it to be delivered directly to the defendant for his examination and use."  The term "statement" is defined as: (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."  18 U.S.C. § 3500(e).  However, as the Government notes, § 3500(a) limits production to the time period after a covered witness testifies ("In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."); accord United States v. Percevault, 490 F.2d 126, 132 (2d Cir. 1974) (holding that "the government cannot be compelled to disclose statements of prospective witnesses prior to the time prescribed by the Jencks Act").

### B.  Discussion

Defendants move for discovery seeking Brady, Giglio, and Jencks Act material, including "documents in the possession,

custody, or control of the United States Attorney's Office for
the District of Connecticut, the Department of Homeland Security
(including the Bureau of Citizenship and Immigration Services and
the Bureau of Immigration and Customs Enforcement), the Federal
Bureau of Investigation, the Attorney General's Office for the
State of Connecticut, the State of Connecticut Department of
Labor, and any other federal, state, and local agency or
authority that investigated the facts relating to this matter."
Def. Mot. for Discovery [Doc. # 51] at 2-3.  Defendants also seek
disclosure of "drafts and rough notes of interview Reports of
Investigation prepared by the Department of Homeland Security,
Bureau of Immigration and Customs Enforcement (the "ICE Reports")
relating to the Defendants, and drafts and rough notes of any
interview memorandum relating to Defendants, or any investigation
into Dunkin' Donuts regarding the facts of this case. . . . [T]o
satisfy its Giglio obligations, the government should be ordered
to examine the rough notes and compare them to other statements
of any witness they intend to call at trial.  If the notes
contradict other statements by the same witness, the government
should be order [sic] to produce them.  In any event, such rough
notes or drafts of interview memoranda are likely to contain
information material to the preparation of the defense."  Id. at
3-4 (citing United States v. Harrison, 524 F.2d 421, 427-28 (D.C.
Cir. 1975)).

34

The Government represents that it "has turned over any documents or items that it deems material to [the] defense [and] all Brady and Giglio information currently in its possession." Gov't Opp. to Discovery Mot. [Doc. # 66] at 5.  The Government also provides that it did not conduct the investigation in this case with any state or local agency (nor has it requested any documents therefrom) and thus it does not have constructive possession of any material that such an agency might have.  Id. Additionally, the Government disputes the relevance of certain types of information typically disclosed to a defendant in a criminal case, noting inapplicability to this case.  Id. at 6-7 (e.g., defendants were not involved in a line-up, no physical or mental examinations were conducted, et cetera).

As a general matter, the Supreme Court has "never held that the Constitution demands an open file policy," Kyles, 514 U.S. at 437, as "[a]n interpretation of Brady to create a broad, constitutionally required right of discovery would entirely alter the character and balance of our present systems of criminal justice. . . . Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." United States v. Bagley, 473 U.S. 667, 675 (1985).

35

As to the Brady/Giglio material, the Government represents
that it has produced all material it considers to be Brady and/or
Giglio material and indeed the Government states that it has
produced all of its documents related to this case except grand
jury materials (although it has produced the grand jury
transcript of one witness as potential Brady material) and
Government work product in the form of law enforcement reports
and other documentation (although the Government represents that
it has produced "most" of the finalized law enforcement reports,
notwithstanding its contention that such constitute privileged
work product).[5]  "[D]istrict courts in this circuit routinely
accept [this] type of representation that the Government has made
concerning Brady [and Giglio] material." United States v.
Savarese, No. 01cr1121(AGS), 2002 WL 265153, at *2 (S.D.N.Y. Feb.
22, 2002); accord United States v. Upton, 856 F. Supp. 727, 746
(E.D.N.Y. 1994) ("To the extent that the government represents
that it 'has produced every document in its possession which
relates in any way to this case,' . . . the court must assume the
veracity of that representation.").  Moreover, defendants'
request for such information amounts to no more than "mere
speculation" that the Government has not provided everything that

---

[5] As a general matter, Fed. R. Crim. P. 16(a)(2) exempts
from disclosure "reports, memoranda, or other internal government
documents made by an attorney for the government or other
government agent in connection with investigating or prosecuting
the case."

it is obligated to disclose, which is insufficient to justify any order of additional disclosure or discovery.[6]

As to the Jencks Act material, as the Government notes, defendants' motion is premature.  Moreover, defendants have made no showing that the requested documentation, including investigative and law enforcement reports and notes, contains statements used or adopted by any prospective witnesses, so as to trigger the Court's obligation to review such documentation in camera.  See United States v. Henke, 222 F.3d 633, 642 (9th Cir. 2000) (district court's obligation to review privileged pretrial interview notes not "trigger[ed]" where "defendants made no showing that they might discover something exculpatory or impeaching, [n]or did they show that the notes were used or adopted by the witness").  Nevertheless, the Government proposes in its opposition memorandum an arrangement by which each side

---

[6] See United States v. Navarro, 737 F.2d 625, 631 (7th Cir. 1984) ("Mere speculation that a government file may contain Brady material is not sufficient to require a remand for in camera inspection. . . . A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court."); United States v. Milikowsky, 896 F. Supp. 1285, 1309 (D. Conn. 1994) ("The Defendants have provided no basis upon which this Court can distinguish their desire to peruse the prosecutors' notes from that of all other criminal defendants who believe they would benefit from reading the prosecutors' interpretations and descriptions of interviews with unsworn witnesses.  Were this Court to grant the Defendants' motion, it would set an absurd precedent, allowing defendants to scour the working notes of prosecutors upon the mere accusation that the government has not sufficiently disclosed every potentially exculpatory detail."), aff'd 65 F.3d 4 (2d Cir. 1995).

would comply with its respective disclosure obligations on "an early basis that is fair to both sides," Gov't Opp. to Mot. for Discovery at 12; however the Court is not aware that any such agreement has been reached between the parties.  For purposes of effective and thorough trial preparation and to the extent that any Jencks Act material exists, which is discussed in greater detail below, the Court directs the Government to disclose any such material no later than 10 days prior to commencement of trial evidence.  Pursuant to the Local Standing Order On Discovery in criminal cases, defendants shall similarly disclose any statements of any of their witnesses in their possession and relating to the subject matter of a witness's testimony no later than 10 days prior to commencement of trial evidence.

Turning to the heart of the Jencks Act dispute, the Act provides for disclosure of only "any statement . . . of [a prosecution] witness in the possession of the United States which relates to the subject matter as to which the witness has testified," defined as "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription

thereof, if any, made by said witness to a grand jury." 18 U.S.C.
§ 3500(b), (e).[7]  Notes and/or reports may be considered
"substantially verbatim recital[s]" of a witness's statement if
they "could fairly be deemed to reflect fully and without
distortion what had been said to the government agent," and are
thus competent impeachment evidence for trial.  <u>Palermo v. United
States</u>, 360 U.S. 343, 352 (1959).  This standard "was designed to
eliminate the danger of distortion and misrepresentation inherent
in a report <u>which merely selects portions, albeit accurately,
from a lengthy oral recital.  Quoting out of context is one of
the most frequent and powerful modes of misquotation</u>.  We think
it consistent with this legislative history, and with the
generally restrictive terms of the statutory provision, to
require that summaries of an oral statement which evidence
substantial selection of material, or which were prepared after
the interview without the aid of complete notes, and hence rest
on the memory of the agent, are not to be produced.  Neither, of
course, are statements which contain the agent's interpretations
or impressions."  <u>Id</u>. (emphasis added).  Accordingly, a "third

---

[7] The Court notes that "a writing prepared by a Government
lawyer relating to the subject matter of the testimony of a
Government witness that has been 'signed or otherwise adopted or
approved' by the Government witness is producible under the
Jencks Act, and is not rendered nonproducible because a
Government lawyer interviews the witness and writes the
'statement.'" <u>See</u> <u>Goldberg v. United States</u>, 425 U.S. 94, 98,
101-02 (1976).

party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (internal quotation omitted).  And thus, defendants are not entitled to summaries of a witness's statement, "fragmentary notes, jottings, scraps or writings which are not 'substantially verbatim,'" "rough, choppy, disjointed, scattered jottings full of sentence fragments," or "shorthand, sketchy notes" that are "bare-bones summary of the witness's remarks."  See United States v. Allen, 798 F.2d 985, 994 (7th Cir. 1986); United States v. Thomas, 282 F.2d 191, 194 (2d Cir. 1960); United States v. Sainato, 29 F. Supp. 2d 116, 118 (E.D.N.Y. 1998); United States v. Viola, No. 91cr800 (SJ), 1992 WL 333650, at *1 (E.D.N.Y. Nov. 2, 1992).

The Government submitted the notes and law enforcement reports sought by defendants and the Court has thus reviewed them in camera.  The notes, written in various handwritings and degrees of legibility, with the exception of one document, do not appear to be "substantially verbatim recital[s]" of witness statements as they are partly composed of "jottings" or "scraps of writing," are "fragmentary," non-narrative, and appear in some cases to be excerpts and/or summaries and characterizations of witness statements, sometimes including notes of impressions. The law enforcement reports, however, while not actual verbatim

40

transcripts of the witness interviews, appear to be comprehensive
and  detailed recitals of what each witness told the
interviewers.  Indeed, they are in the form of "[the witness]
made the following statements . . .," "[the witness] stated . .
.," "[the witness] went on to explain . . .," and therefore
might, if properly redacted to omit the questions or statements
of the Assistant United States Attorney, constitute substantially
verbatim recitals of each witness's statements.  Similarly, the
notes of an "8 June 2006" "Follow Up" is in Question-and-Answer
format and thus appears to also be a substantially verbatim
recital of the witness's answers to specific questions.
Accordingly, the Court will consider requiring the Government to
produce the law enforcement reports not yet disclosed and the one
additional document containing notes of the June 8, 2006
interview, after receiving the Government's witness list and, if
any of these individuals will be called as prosecution witnesses
at trial, hearing further from the Government as to why the
appearances of these documents as substantially verbatim recitals
may have been misleading to the Court.

       With respect to the grand jury transcripts, as discussed
above in connection with the Court's analysis of defendants'
Motion to Dismiss, "absent any suggestion of grand jury bias or
that [the grand jury] was illegally constituted," the Indictment
alone "is enough to call for trial of the charge on the merits"

and disclosure or in camera review of the grand jury transcripts
is not warranted.  See Costello, 350 U.S. at 363; Shakur, 560 F.
Supp. at 350.  Further, "[g]rand jury proceedings carry a
'presumption of regularity' [and] [a] review of grand jury
minutes is rarely permitted without specific factual allegations
of government misconduct."  United States v. Torres, 901 F.2d
205, 232-33 (2d Cir. 1990).  The Government represents that it
has produced the portion of those transcripts which contains
possible Brady material and, as discussed above, the Court
assumes that representation is accurate.  Moreover, defendants do
not allege grand jury bias or other illegal constitution, or
government misconduct.  Accordingly, defendants' motion in this
respect must be denied.

## V.   Conclusion

For the foregoing reasons, defendants' Motion to Dismiss and
For Access to Grand Jury Transcripts and/or For In Camera Review
[Doc. # 55] is DENIED.  Defendants' Motion for a Bill of
Particulars [Doc. # 52] is GRANTED in part and DENIED in part,
and the Government is directed to provide identification of the
aliens at issue in each of Counts 1 through 5 of the Superseding
Indictment within 10 calendar days from the date of this ruling.
Defendant's Motion for Discovery [Doc. # 50] is DENIED as
detailed above, with sua sponte reconsideration to be given with
respect to the possible Jencks Act material identified above,

42

after the Government's witness list is provided.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 10th day of October, 2006.**